## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JOSEPH O'DONNELL, individually and
t/a Top Glove Promotions,

Plaintiff,

    v.

OLEG SHALAYEV, Individually and t/a
Oleg Shalayev Promotions, and
NICOLAI VALUEV

     Defendants.

CIVIL ACTION NO. -CV-4721 (JBS)

---

## BRIEF IN OPPOSITION TO MOTION OF DEFENDANT VALUEV TO
## VACATE FINAL JUDGMENT

---

Gregory D. Saputelli, Esquire (7140)
Kimberly D. Sutton, Esquire (8229)
**OBERMAYER, REBMANN, MAXWELL
HIPPEL, LLP**
20 Brace Road, Suite 300
Cherry Hill, New Jersey 08034
(856) 795-3300
*Attorneys for Plaintiffs*

George Bochetto, Esquire (pro hac)
David P. Heim, Esquire (5846)
**BOCHETTO & LENTZ, P.C.**
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
*Attorneys for Plaintiffs*

53397

## TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                              ii-iv

I.      INTRODUCTORY STATEMENT                                                    1-3

II.     PROCEDURAL HISTORY                                                        4-5

III.    RELEVANT FACTUAL BACKGROUND                                              5-19

IV.     ARGUMENT                                                                 19-44

        A.    The Judgment is Not Void Since Valuev Had Personal Service of
              Process and Actual Notice of the Lawsuit From Its Very
              Inception; He Knew that the Suit Was Significant; He
              Knew a Final Judgment Had Been Entered Against Him;
              And He Demonstrated Disregard For The Consequences of
              Both The Suit and the Judgment                                     19-26

        B.    Service of Process Under the Hague Service Convention Was
              Neither Required Nor Possible                                       26-29

        C.    Valuev Has Presented No Basis To Vacate The Default Judgment
              Under Fed. R. Civ. Pro. 60 (b) (6)                                  29-34

              (i)    The Failure to File the Motion Within a Reasonable
                     Time Precludes the Defendant's Request for Relief
                     From Final Judgment Under Rule 60(b)                         30-32

              (ii)   Valuev Has Not Presented "Extraordinary Circumstances"
                     to Warrant Relief Under Fed.R.Civ. Pro. 60(b)(6)             32-34

        D.    The Exclusive Agreement Is Enforceable                             34-43

              (i)    The Agreement Does Not Violate the Muhammad Ali Act         34-39

              (ii)   The Agreement Is Not Indefinite                            39-44

V.      CONCLUSION                                                                44

53397

# **TABLE OF AUTHORITIES**

**Cases**

*Ackerman v. United States*, 340 U.S. 193, 95 L. Ed. 207, 71 S. Ct.
209 (1950)     33

*Admiral Home Appliances, Div. Of Magic Chef, Inc. v. Tenavision, Inc.*,
(D.C N.J. 1982) 585 F.Supp. 14, aff'd without op F2d 1347 (3rd Cir.)     31

*Allied Disposal, Inc. v. Bob's Home Serv., Inc.*, 595 S.W. 2d 417
(Mo.Ct.App. 1980)     42,43

*Ben Sager Chemicals Int'l v. E. Targosz & Co.*, 560 F.2d 805, 809
(7th Cir. 1977)     33

*Bricks, Inc. v. CME Housing Group*, 209 F.R.D. 416 (W.D. Tenn. 2002)     30

*Cartwright v. Fokker Aircraft U.S.A., Inc.*, 713 F.Supp. 389 (1988, ND Ga)     29

*Don King Productions, Inc. v. Douglas*, 724 F.Supp. 741 (S.D.N.Y. 1990)     42,43

*Eletronics Bountique Holdings Corp. v. Zuccarini*, 2001 U.S. Dist.
LEXIS 765 (E.D. Pa. Jan. 25, 2001) affirmed 33 Fed. Appx. 647,2002
U.S. App. LEXIS 9247 (2002)     20-22

*Emacasco Ins. Co. v. Sambrick*, 843 F.2d 71, 73 (3rd Cir. 1987)     30

*Forum Fin. Group, LLC v. Harvard College*, 199 F.R.D. 22,
23-24 (D.Me.2001)     28

*Gloeckner v. School District of Township of Baldwin*, 405 Pa 197, 202,
175 A.2d 73, 76 (1961).     30

*Gold Kist, Inc. v. Laurinburg Oil Co., Inc.*, 756 F.2d 14, 19 (3d Cir. 1985)     30

*Gross v. Stereo Component System, Inc.*, 700 F.2d 120, 122 (3rd Cir.
1983)     30

*Hoffman v. Celebreezze*, 405 F.2d 833, 835 (8th Cir. 1969)     33

*Hough v. Local 134 IBEW*, 867 F.2d 1018, 1022 (7th Cir. 1988)     33

*Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984)     30

*Int'l Broth. Of Elect. Workers v. Skaggs*, 130 F.R.D. 526, 529
(D. Del. 1990)                                                                                      30

*Isometrics v. U.S. Energy Research & Dev. Agcy.*, 434
F.Supp. 1155 (D.N.J.1977)                                                                           28

*Laveson v. Waner Mfg. Corp.*, 117 F.Supp. 124 (D.N.J. 1953)                                        41

*Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34, 8L. Ed.2d
734, 82 S. Ct. 1386, (1962)                                                                         33

*Mantell v. Int'l Plastic Harmonica Corp.*, 141 N.J.Eq. 379, 55
A.2d 250 (1947)                                                                                     40,41,43

*Marcantonio v. Primorsk Shipping Corp.*, 206
F.Supp.2d 54, 56 (2002)                                                                             28

*Marchio's International productions v. Letterlough and Marley*,
237 F.2d (E. D. Pa. 2002)                                                                           36

*Marcor Management, Inc. v. IWT Corp.*, No. 96-CV-1519 FJS,
1998 WL 809011 (N.D.N.Y. Nov. 17, 1998)                                                             41,42,43

*Marshall v. Board of Education, Bergenfield, New Jersey*, 575
F.2d 417,425 (3d Cir. 1978)                                                                         20

*Martinez-McBean v. Govt. of Virgin Islands*, 562 F.2d 908,
911, 14 V.I. 79                                                                                     33

*Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977)                                           33

*Mayfield v. Vanguard Sav. & Loan Ass'n*, 1989 U.S. Dist. LEXIS 11017,
No. Civ.A. 88-0410, 1989 WL 106986 at *2 (E.D. Pa. Sept. 8, 1989)                                   33

*Mississippi Publ'g Corp. v. Murphree*, 326 U.S. 438, 444-45,
90 L. Ed. 185, 66 S. Ct. 242 (1946)                                                                 20

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 320,
94 L. Ed. 865, 70 S. Ct. 652 (1950)                                                                 20

*Page v. Schweiker*, 786 F.2d 150, 158 (3d Cir. 1986)                                               32

*Pryor v. United States Postal Service*, 769 F.2d 281, 287 (5th Cir. 1955)                        33

*Seanor v. Bair Transport Co.*, 54 F.R.D. 35 (E.D. Pa. 1971).                                       34

*Stradeley v. Cortez*, 518 F.2d 488, 493 (3d Cir. 1975)                     33

*United States v. Walker*, 109 U.S. 258, 265-67, 27 L.Ed.
927, 3 S. Ct. 277 (1883)                                                    20

**Rules of Procedure**

Rule 60 of Federal Rules of Civil Procedure                  6,33,34,35,37,38

**Statutes**

"Muhammad Ali Act, " 15 USC § 6308 *et seq*                          34-39

Uniform Commercial Code §2-305                                       39

**Treatises**

Jacklin, Beverly L ,J.D., Annotation, *Service of Process By Mail in International
Civil Action As Permissible Under Hague Convention*, 112 A.L.R. Fed. 241 (1993)    31,33

Restatement (2nd) Contracts, §33                                     39-40

**Treaties**

Hague Convention of the Service Abroad of Judicial and Extrajudicial
Documents in Civil or Commercial Matters                       5,22,30,31,32,33

# I. **INTRODUCTORY STATEMENT**

In this motion, defendant, Nicolai Valuev ("Valuev), a heavyweight boxer who resides in St. Petersburg, Russia, moves to vacate the Final Judgment entered against him on March 28, 2002, asserting two separate grounds, neither of which has any basis. Specifically, Valuev contends (a) that the Final Judgment is void, on the contention that he was never served with the lawsuit; and (b) he has a meritorious defense, which he claims, warrants the vacation of the Final Judgment more than two years after its entry, and nearly two and a half years after having been served with the Complaint.

As will be demonstrated, Valuev had personal service of process and actual notice of both the filing of the Complaint and of the entry of the Final Judgment that was subsequently entered. Valuev's sworn statements contained in Paragraphs 4 and 5 of his Certification (included in Exhibit L to his motion papers) are patently false, and are refuted not only by his own signed letters, but also by admissions contained in a pleading transmitted to the Court by his prior Russian attorney and filed on November 8, 2001.

Valuev's reliance on the Hague Service Convention is also misplaced as it has still not become effective in Russia. The United States has not recognized Russia's accession as a Convention member because of the Russian Federation's continued failure to identify a Central Authority that is authorized to carry out duties required by the Convention. *See* July 21, 2004 letter from the United States Department of State, attached hereto as **Exhibit A**; *see also* Saputelli Certification at ¶¶ 20-26 and exhibits referenced therein.

Third, insofar as Valuev's alleged meritorious defense, that defense is not properly presented in this motion since he has failed to demonstrate that the judgment is void, and since he failed to timely request the relief he now seeks due to his demonstrated disregard for the consequences of both the suit

53397

1

and the judgment. In addition, Valuev erroneously asserts a "just cause" standard, when the controlling standard to be applied, when vacating the Final Judgment under FRCP 60(b)(6) ("any other reason justifying relief from the operation of the judgment"), is exceptional circumstances that were timely presented. Valuev's motion does not present any "exceptional circumstances" nor can he contend that he moved for relief within a "reasonable time". Indeed, Valuev's motion was filed more than two years and three months after having first been provided with a copy of the Final Judgment, translated into Russian, and two years after having had a discussion with O'Donnell concerning the terms of the Final Judgment, which is clearly untimely. Thus, there is no legitimate basis upon which the Court should reach or address Valuev's arguments on the merits of his alleged "meritorious defense".

Assuming *arguendo* that the merits of Valuev's alleged defense are considered, they are baseless. First, the Muhammad Ali Act does not apply to the "Exclusive Representation Agreement" that the parties signed on February 28, 2001, to the extent that it governs boxing matches that are conducted outside the United States, which are expressly contemplated by the Agreement. With respect to those boxing matches of 10 rounds or more that are to be conducted in the United States, the Exclusive Representation Agreement does not violate or otherwise offend the Muhammad Ali Act, as there is no requirement in the agreement that O'Donnell, the promoter, serve as Valuev's manager, and rather, the Exclusive Representation Agreement expressly recognized that Valuev's then manager, Oleg Shalayev ("Shalayev") continued in that role, without interference by O'Donnell. Nor does the Exclusive Representation Agreement direct that Valuev's manager obtain a direct financial interest in the promotion of a boxer, other than what he was entitled to receive as consideration under the contract that was already in existence between Valuev and Shalayev, as his manager. That understanding has been confirmed by the subsequent conduct of the parties and the governing facts, none of which are

presented by Valuev in his motion.  In fact, Shalayev, who was Valuev's Manager, has not even joined Valuev in bringing this motion.  According to Valuev's motion papers, Shalayev is no longer Valuev's Manager and "has no continuing relationship" with Valuev, making moot the argument, that Valuev serves as both promoter and manager in the Exclusive Representation Agreement.  (*See* Exhibit A to Certification of Patrick English; *see also* Valuev Certification at ¶ 6).  Valuev is the sole remaining "Russian Party" to the Agreement, Arseny Berezin having also resigned as one of the "Russian Parties" in August of 2001. *See* O'Donnell Certification at ¶ 6

The utter absence of good faith on the part of Valuev also warrants that the motion be denied. Despite his clear knowledge of the entry of the Final Judgment for more than two years, Valuev sat supinely by and repeatedly ignored his obligations under the Final Judgment and his agreement with O'Donnell, only to file this motion now that he seeks to fight in the United States, under the promotion of Sauerland Event, a German boxing promoter. Valuev and Sauerland Event entered into a Promotion Agreement within the past several months, even though Sauerland Event had direct knowledge of O'Donnell's Exclusive Agreement and had a copy of the Final Judgment in its possession. Sauerland Event also promoted Valuev in three fights in Germany, and is scheduled to promote him in a fourth fight in Germany on July 24, 2004, in direct contravention of the terms of the Final Judgment. It is readily apparent that Sauerland Event is the driving force behind Valuev's untimely motion to vacate, in its transparent attempt to absolve itself of liability for violations of the Final Judgment, and to remove the obstacles that the Final Judgment poses to Sauerland Event's future promotion of Valuev in boxing matches in the same geographical areas reserved for O'Donnell, as Valuev's exclusive promoter.

## II. **PROCEDURAL HISTORY**

On October 10, 2001, Plaintiffs filed a Complaint against the Defendants herein for breach of contract, breach of the duty of good faith and fair dealing, fraud, tortious interference with contractual relations and prospective economic advantage, declaratory and injunctive relief, and for an account.[1] Plaintiffs' claims arise out of its Exclusive Representation Agreement ("the Agreement") with Defendant Valuev. Although O'Donnell had been performing his obligations under the Agreement, at a cost exceeding $176,000.00, Defendant Valuev, together with his Russian "Manager," Defendant Shalayev, refused to abide by the Agreement, and the Court has found that Shalayev had engaged in continuing efforts to extort money from Plaintiffs.[2]

After filing the Complaint, Plaintiff filed a Motion for Preliminary Injunctive Relief and for an Accounting on or about December 31, 2001. *See* Exhibit B, Docket Entry No. 10. Simultaneously, Plaintiffs filed a Motion to Strike the Russian language Answer to the Complaint filed by the Defendants and to enter default judgment against them. *See* Exhibit B, Docket Entry No. 4. The Court subsequently held a hearing on February 13, 2002 concerning both Motions. *See* Exhibit B, Docket Entry No. 15-18. Although the Defendants were both duly served with Plaintiffs' moving papers, and were given notice of the hearing, neither of them appeared.

After conducting a hearing, the Court granted both Motions, thereby entering default judgment as to liability and granting various preliminary injunctive relief. *See* Exhibit B, Docket Entry Nos. 15,

---

[1]   A copy of the Court's Docket Report is attached hereto as **Exhibit B**.  A copy of the Complaint, without exhibits, is attached as Exhibit K to the  Certification of Joseph O'Donnell ("the O'Donnell Certification").

[2]   *See* Transcript of hearing conducted before the Honorable Jerome B. Simandle on February 13, 2002, at 47, attached as Exhibit I to Saputelli Certification.

16 and 18.  *See also* Transcript of hearing conducted before the Honorable Jerome B. Simandle on February 13, 2002, attached as Exhibit I to Saputelli Certification; *see also* Orders dated February 13, 2002, and February 14, 2002, attached as Exhibit H to the Saputelli Certification.

On March 26, 2002, the Court conducted a final hearing to assess Plaintiffs' damages and to determine the need for final injunctive and declaratory relief.  *See* Exhibit B, Docket Entry No. 23.  As a result of that final hearing, on March 28, 2002, the Court entered a "Final Judgment" in favor of Plaintiffs and against both Defendants.  *See* Exhibit B, Docket Entry No. 24.[3]  The Final Judgment granted Plaintiffs a money judgment against Defendants in the amount of $176,783.04, as well as various forms of injunctive and declaratory relief, including an injunction prohibiting Defendants from engaging in any boxing events, except through Plaintiff, anywhere in the world, except Russia.  *See* Final Judgment at ¶¶ 1, 5-7, Exhibit K to the Saputelli Certification.

In Paragraph 2 of the Final Judgment, the Court extended the term of the Agreement for 222 days, making the new termination date October 7, 2004.  The 222-day extension represented the time period between the first day of Defendants' breach –August 16, 2001 – and the date of the damages hearing in this case, March 26, 2002.  Final Judgment at ¶ 2.

### III.  RELEVANT FACTUAL BACKGROUND

Plaintiffs hereby incorporate the entire contents of the separate Certifications of Gregory D. Saputelli and of Joseph O'Donnell as though same were fully set forth herein at length.  Relevant Facts set forth in those Certifications that are particularly material to Valuev's motion and to O'Donnell's opposition thereto, include the following:

---

[3]  A copy of the Final Judgment is attached as Exhibit K to the O'Donnell Certification.

1.      On or about February 28, 2001, O'Donnell signed an Exclusive Representation Agreement (hereinafter either "Exclusive Agreement" or "Agreement") with the Defendants, pursuant to which O'Donnell was given the exclusive rights to promote any and all of Valuev's professional boxing matches in the United States and worldwide, except Russia.  (O'Donnell Certification at ¶ 2)

2.      Valuev, Shalayev and a third party, Mr. Arseny Berezin ("Berezin"), who signed the Agreement as a "Consultant," comprised  "The Russian Parties" to the Agreement.   O'Donnell and his partner, Guennadi Synkov ("Synkov"), are, together, "The US Parties" to the Exclusive Agreement, a true and correct copy of which is attached as Exhibit A to the O'Donnell Certification.   (O'Donnell Certification at ¶ 3)

3.      In Paragraph 13, on page 4 of the Agreement, entitled, "Addresses For Legal Notices," "The Russian Parties" "agree[d] to use the following address for legal notices:"

> "The Russian Parties:  [c/o] Oleg Shaleyev, Koroleva str. 9, apt. 28,
> St. Petersburg, 197431 Russia."

(O'Donnell Certification at ¶ 4)

4.      On March 12, 2001, following the final execution of the Exclusive Agreement, Berezin, one of  "The Russian Parties" to the Agreement, sent an e-mail to Synkov, providing him, *inter alia*, with addresses for Shalayev and Valuev.  The address provided by Berezin for Shalayev was the same as that noted in Paragraph 13 of the Agreement.  In addition, Berezin gave the following address for Valuev:

> "Valuev, Nikolay Sergeevich St. Petersburg, Krasnoselsky Rayon,
> Krasnoye Selo, Ul.[4] **Gvardesyskaya 8/2 apt 39**"

---

[4] "Ul" is the Russian abbreviation for "Ulitsa," which means "Street."

A copy of Berezin's e-mail to O'Donnell's partner, Synkov, is attached as Exhibit B to the O'Donnell Certification.   (O'Donnell Certification at ¶ 5)  This is the very same address where Valuev was served, which he now claims was not his residence or business address in 2001 or 2002.

5.    Following receipt of Berezin's March 12, 2001 e-mail, most, if not all of O'Donnell's written communications to Valuev were sent or delivered to him either at the Gvardesyskaya Street address provided by Berezin, or at the address designated in the Exclusive Agreement for legal notices. At no time was O'Donnell ever provided with a different address for Valuev, other than those specified above.  Subsequently, on or about August 18, 2001, Berezin resigned as one of "The Russian Parties.". (O'Donnell Certification at ¶ 6; *see also* Berezin's e-mails attached as Exhibit C to O'Donnell Certification)

6.    Although O'Donnell has invested more than $176,000.00 performing his obligations under the Agreement[5], Valuev participated in just one boxing event, on June 30, 2001, in Atlantic City, New Jersey, and then, both he and Shalayev subsequently refused to participate in any further events under the Agreement.  (O'Donnell Certification at ¶ 8)

7.    In or about mid-August of 2001, O'Donnell informed Valuev and Shalayev that they were in default of their obligations under the Exclusive Agreement and that if Valuev didn't come to the U.S. immediately to participate in boxing events under the terms of the Exclusive Agreement, that O'Donnell intended to institute litigation against them for damages and injunctive relief.  (O'Donnell Certification at ¶ 10)

8.    Subsequently, on or about August 22 and 23, 2001, O'Donnell transmitted to Valuev and Shalayev, via fax, copies of the Complaint that he later filed, which had been translated into the Russian

---

[5] *See* ¶ 1 of the Final Judgment.

language.  O'Donnell simultaneously sent a copy of the Russian language Complaint to Mr. Vaja Mikaelyan, President of the St. Petersburg Professional Boxing Association, who had served as one of the judges at Valuev's fight in Atlantic City in June of 2001.  Attached to the O'Donnell Certification as Exhibit E is a copy of the Russian language translation of the Complaint that O'Donnell sent to Valuev, Shalayev and Mikaelyan on or about August 23, 2001.  Attached to the O'Donnell Certification as Exhibit F thereto are true copies of the transmittal letters that accompanied the Russian language Complaint. (O'Donnell Certification at ¶ 11)

9.    On or about August 23, 2001, O'Donnell received a faxed letter from Valuev and Shalayev, personally signed by both of them, acknowledging receipt of the translated Russian language Complaint against them, and advising that they would not be able to respond immediately, since they needed to consult with a "experts."  O'Donnell states that he is familiar with Valuev's and Shalayev's signatures.   Attached to the O'Donnell Certification as Exhibit G is a copy of the joint August 23, 2001 letter from Valuev and Shalayev. (O'Donnell Certification at ¶ 12)

10.    Also on or about August 23, 2001, Shalayev and Valuev both telephoned O'Donnell to discuss the Complaint that they had received from him.  O'Donnell's partner, Synkov, participated in the phone call with O'Donnell, and translated their discussion.  During that telephone conversation, Valuev and Shalayev demanded that O'Donnell finance the promotion of a Valuev fight in St. Petersburg, Russia, instead of having Valuev fight in the U.S.  At the same time, Shalayev advised O'Donnell that both he and Valuev were concerned that if O'Donnell proceeded with the filing of the Complaint, that they would be "prosecuted" when they came to the U.S. for further fights. O'Donnell told them that they were responsible under the Agreement for any fights in Russia and that his obligation was to promote fights outside of Russia.  O'Donnell also assured them that if Valuev would come to the U.S. for further

fights under his promotion, that he would delay filing the Complaint, and guaranteed them that they would not be "prosecuted." On August 25, 2001, Shalayev faxed O'Donnell another letter, repeating his demand that O'Donnell finance a fight in Russia. Attached as Exhibit H to the O'Donnell Certification are copies of Shalayev's August 25, 2001, letter to O'Donnell and his August 29, 2001 letter to him in response. O'Donnell states that, contrary to the statement in Shalayev's letter, he never told either Shalayev or Valuev that he was unable to arrange fights in the U.S. "due to financial difficulties," and, in fact, that he had advised both of them that he had lucrative offers from Caesar's casino and ESPN if Valuev would fight.

11.     On or about September 11, 2001, several weeks after Valuev and Shalayev had received a copy of the translated Complaint, O'Donnell received a letter, via fax, from an attorney in St Petersburg, Russia, Evgeny Vasilevich Popov, the legal "expert" with whom Valuev and Shalayev consulted about the Complaint. In the first sentence of his letter to O'Donnell, Mr. Popov states: "I have been retained by Oleg Shalayev and Nikolay Valuev to represent and protect the interests of The Russian Parties in Top Glove Promotions." A copy of Mr. Popov's letter is attached to the O'Donnell Certification as Exhibit I. (O'Donnell Certification at ¶ 14)

12.     On October 10, 2001, the date on which the Complaint was filed, Shalayev faxed O'Donnell a letter in which he asserted three demands as pre-conditions for Valuev to come to the U.S. to fight, one of which demands was that a license be obtained for him [Shalayev] in New Jersey, authorizing him to be a Co-Promoter, along with Top Glove in the U.S., in addition to his role as Manager for Valuev. On October 11, 2001, O'Donnell faxed his response to Shalayev, a copy of which is attached to the O'Donnell Certification as Exhibit J, rejecting his demand and advising him, in part, that:

> For you to be a co-promoter with Top Glove in the United States would not only be a circumvention of the Exclusive Representation Agreement, but would be illegal under New Jersey boxing laws, as well as under most state boxing statutes throughout the United States.

(O'Donnell Certification at ¶ 15)

13.    When the Defendants' breaches of the Exclusive Agreement continued unabated, O'Donnell instituted this action against Defendants Shalayev and Valuev by filing of the Complaint on October 10, 2001 based, *inter alia*, on Defendants' alleged breach of contract, tortious interference with contract and fraud.  A copy of the Complaint filed herein, without exhibits thereto, is attached to the O'Donnell Certification as Exhibit K.  (O'Donnell Certification at ¶ 13)

14.    On October 10, 2002, O'Donnell's counsel, Mr. Saputelli served a copy of the Summons and Complaint, along with an explanatory letter, via DHL Worldwide Express, at the address designated in Paragraph 13 of the Exclusive Agreement for service of "legal notices" upon The Russian Parties," c/o of Defendant Shalayev ("Koroleva St. 9, Apt. 28, St. Peterburg").  Attached as Exhibit A to the Saputelli Certification is a copy Saputelli's transmittal letter, together with a copy of documents received from DHL indicating delivery on October 17, 2001 at 2:30 pm.  (Saputelli Certification at ¶ 3)

15.    On October 10, 2002, Saputelli served an additional copy of the Summons and Complaint, along with an explanatory letter, via DHL Worldwide Express, at the address designated for Valuev to O'Donnell's partner, Synkov by Berezin, one of The Russian Parties under the Exclusive Agreement. *See* O'Donnell Certification at ¶ 5. Attached as Exhibit B to the Saputelli Certification is a copy of Saputelli's transmittal letter to Valuev, together with copies of documents received from DHL indicating delivery on October 16, 2001 at 2:03 pm. (Saputelli Certification at ¶ 4)

16.     Copies of the foregoing were also simultaneously served on Valuev's and Shalayev's attorney, Evgeny Popov, via DHL Worldwide Express.  Attached as Exhibit C to the Saputelli Certification are copies of documents received from DHL indicating delivery on October 16, 2001 at 2:19 pm, signed for by Mr. Popov's secretary, Ms. Kuznetsova. (Saputelli Certification at ¶ 5)

17.     On October 26, 2001, ten (10) days after Valuev and Sahalyev were served with the Complaint, they jointly wrote a letter to O'Donnell, in which they specifically acknowledged receipt of service of the Complaint.  A copy of Mr. Valuev's and Shalayev's joint letter, signed by both of them, is attached as Exhibit L to the O'Donnell Certification.  (O'Donnell Certification at ¶ 18)

18.     On or about November 14, 2001, less than a month after Valuev, Shalayev and their attorney Popov were served, Saputelli received a call from Marcy Barratt of the U.S. District Court Clerk's Office.  Ms. Barratt advised that she had received documents written in a foreign language, which she believed may have been prepared by the Defendants in this case, and asked Saputelli if he had any address, telephone number or e-mail address for defendants' attorneys. (Saputelli Certification at ¶ 6)

19.     Attached as Exhibit D to the Saputelli Certification is a copy of his prior Certification dated December 31, 2001, previously filed with the Court, which provides details regarding the manner of service of the Complaint upon the Defendants and their attorney, and regarding the communications between attorney Popov and Ms. Barratt of the Clerk's office, to which is attached the e-mails exchanged between Popov and the Court.  (Saputelli Certification at ¶ 7)

20.     Subsequently, Ms. Barratt provided Saputelli with a copy of the document transmitted to her by Mr. Popov, a copy of which is now attached to the Saputelli Certification as Exhibit E, which

53397                                            11

bears the District Court Clerk's stamp, "Filed Nov. 8, 2001." This document filed by Attorney Povov was an Answer to the Complaint on behalf of both Shalayev and Valuev:

        (a)    The top third of the first page identifies the name of Mr. Popov, his law firm, his address, telephone, e-mail and attorney license number.

        (b)    On the left hand side of the first page, is a caption, which lists, in reverse order, "**Ответчики**" ("Respondents"), and then lists "Oleg Shalayev, individually, Oleg Shalayev. Trading as Oleg Shalaeyev Promotions," followed by "**и Никоай Валуев**" ("and Nikolai Valuev").

        (c)    Next on the first page is the heading, "**ОТВЕТ НА ИСКОВОЕ ЗАЯВЛЕНИЕ**" which means, "**ANSWER TO THE NOTICE OF SUIT.**" Immediately below that heading is "**Plaintiffs**," followed by the name of "Joseph O'Donnell, individually, and trading as Top Glove Promotions."

        (d)    The following pages of the Defendants' Russian language Answer track the sections and paragraphs of the Complaint.

        (e)    On page 4 of the Defendants' Answer, in Paragraph 3 under the heading, "**СТОРОНЫ**" ("The Parties") is the statement:

        "3.    Respondent Nicolai Valuev (hereinafter Valuev) appears as a citizen and resident of Saint Petersburg, Russia, and maintains both his principal place of business and residence at Gvardeyskaya **St. 8/2 Apt. 39, Krasnaya Selo, Saint Petersburg, Russia.**"

This Answer to Paragraph 3 under "Parties," corresponds to the same section and paragraph number in the filed Complaint. (Saputelli Certification at ¶ 8)

    21.    On December 31, 2001, Saputelli caused to be filed with the Court:

(a)    A Motion to Strike The Answer filed by Mr. Popov on behalf of Defendants Valuev and Shalayev;

(b)    Motion to Enter Default Judgment;

(c)    Motion for Preliminary Injunction;

(d)    Certification of Counsel with respect thereto; and

(e)    Proof of Service.

*See* Saputelli Certification at ¶ 9 and Exhibit F attached thereto.

22.    As is noted on the correspondence to the Clerk filing the foregoing motions and pleadings, Valuev, Shalayev and Popov were all served with copies of the Motion To Strike, the Motion To Enter Default and the Motion For Preliminary Injunction. Attached to the Saputelli Certification as collective Exhibit F are copies of the following:

(a)    Correspondence, dated December 31, 2001;

(b)    Proof of Service, dated December 31, 2001; and

(c)    DHL "Airway bills" with detailed tracking reports as to deliveries to Valuev, Shalayev and Popov.

Under the heading, "Status" on DHL tracking report relating to Airway bill No. 7435061465, addressed to Valuev, is the following statement:

"**Signed for by: VALUEV**, Shipment delivered
January 11, 2002, 17:15."

(Saputelli Certification at ¶ 10)

23.    Subsequent to the filing of the above-described motions, the Court scheduled a return date of February 13, 2002 for a hearing on Plaintiff's motions. In accordance with the instructions of the

Court, Defendants Valuev and Shalayev, and their attorney, Popov, were served with letter notices that the Court would conduct a hearing on February 13, 2002.  Attached as Exhibit G to the Saputelli Certification is a copy of the Certification of Service, demonstrating that service was effected on February 11, 2002, on both Valuev and Shalayev, as well as on their attorney, Popov, by both fax and personal delivery to his designated address.  (Saputelli Certification at ¶ 11)

24.    On February 13, 2002, the Court conducted a hearing on Plaintiff's motions, following which Orders were entered:

    (a)    Striking the Answer filed by Mr. Popov;

    (b)    Granting default judgment under Rule 55(b);

    (c)    Directing that an accounting be made and provided to Plaintiff;

    (d)    Granting certain injunctive relief; and

    e)    Setting March 26, 2002 as the date on which a final hearing was to be conducted on the default judgment damages and other relief.

Copies of the Court's Orders dated February 13, 2003 and February 14, 2002, are attached collectively as Exhibit H to the Saputelli Certification.  The Court made specific findings that it had subject matter jurisdiction and personal jurisdiction over the defendants. (Saputelli Certification at ¶ 12)

25.    During the February 13, 2002 hearing, the Court made findings of fact concerning, *inter alia*, the pleading filed by Russian attorney Popov and his communications with the Court, and granted Plaintiff's motion to strike under FRCP 12(f).  *See* Transcript of February 13, 2002 hearing, at 6-12, conducted before the Honorable Jerome B. Simandle, attached as Exhibit I to Saputelli Certification.

26.    Copies of the Courts Orders of February 13 and 14, 2002, along with certified translations thereof, were served upon the defendants and their attorney, Popov, via a St. Peterburg

courier service, Courier Express Service, Ltd, as specified in the Court's Orders. Attached as Exhibit J to the Saputelli Certification is the Certification of Service filed with the Court on March 6, 2002, with respect to this service, including copies of the translations. (Saputelli Certification at ¶ 14)

27.    The Court conducted a final hearing on March 26, 2002, and, two days later entered a Final Judgment dated March 28, 2002, a copy of which is attached as Exhibit K to the Saputelli Certification.

28.    In accordance with Paragraph 10 of the Final Judgment, copies of the Final Judgment, along with certified translations, were delivered by Courier Express Service, a St. Petersburg, Russia courier service, as follows:

(a)    Upon Mr. Valuev on March 30, 2002, at 9:20 am;

(b)    Upon Mr. Shalayev on March 30, 2002 at 9:00 am; and

(c)    Upon Mr. Popov's law firm on April 1, 2002 at 4:00 pm.

Attached as Exhibit L to the Saputelli Certification is a copy of the confirmation of delivery provided by Courier Express Service. (Saputelli Certification at ¶ 16)

29.    In or about July of 2002, O'Donnell telephoned Valuev from his office in Vineland, New Jersey, and spoke with him about the Final Judgment that had been entered against him. O'Donnell's partner, Synkov, who is a Russian native, participated in the conversation along with O'Donnell and provided simultaneous translation of his discussion with Valuev. O'Donnell told Valuev that if he came to the United States to participate in boxing events under the Agreement, that he would not let either the litigation or the fact of the judgment interfere with them re-establishing a good working relationship. O'Donnell also told Valuev that if he would come to the U.S. to fight under his (O'Donnell's) promotion, that he would negotiate favorable terms to satisfy the money judgment against him over an

extended period of time out of net proceeds of future events in which he participated.    According to O'Donnell, Valuev expressed appreciation during their conversation for O'Donnell's comments, thanked him and said he would consider O'Donnell's request.  (O'Donnell Certification at ¶ 23)

30.    Notwithstanding O'Donnell's conversation with Valuev in July of 2002, since the time that the Court entered its Final Judgment, Valuev has continued to flagrantly disobey and totally ignore the Court's directives and Final Judgment, and has continued, contumaciously, in his breach O'Donnell's Exclusive Agreement.  (O'Donnell Certification at ¶ 24)

31.    For example, although Valuev has fought on numerous occasions since the entry of the Court's Final Judgment, neither of the Defendants has ever provided any sort of an accounting to O'Donnell, as required by the Final Judgment, nor has either of them made any attempts to satisfy the money Judgment.  (O'Donnell Certification at ¶ 25)

32.    Contrary to the express directive of the Court, Defendant Valuev has fought in nine (9) fights, including seven (7) fights outside of Russia and two fights within Russia, since the Final Judgment was entered, and neither of the Defendants has made any accountings to O'Donnell with respect to his share of the proceeds from said fights, nor has either of them made any payments to O'Donnell whatsoever.  Attached as Exhibit M to the O'Donnell Certification is a summary setting forth all of Valuev's fights since March 28, 2002, as published in "BoxRec.com" (O'Donnell Certification at ¶ 26)

33.    Neither Valuev nor Shalayev has complied with any of the requirements of either the Exclusive Agreement or the Final Judgment entered herein, with respect to any of the fights that have taken place since the entry of the Final Judgment.  (O'Donnell Certification at ¶ 27)

53397                                    16

34.     In August and October of 2003, Valuev fought in two boxing events in Germany under the promotion of Wilfried Sauerland and his company, "Sauerland Event" (hereinafter, collectively, "Sauerland"), one of the two largest boxing promoters in Germany, in violation of both the Final Judgment and the Exclusive Agreement. (O'Donnell Certification at ¶ 35)

35.     O'Donnell sent two letters to Sauerland, one of which he sent himself on September 19, 2003, and the other of which was sent through his counsel on September 30, 2003, notifying Sauerland of his interference with O'Donnell's rights under the Exclusive Agreement and transmitting to him a copy of the Final Judgment and the restraints imposed upon Valuev.   Saurerland acknowledged receipt of Mr. Saputelli's letter of September 30, 2003, in a letter dated October 6, 2003, a copy of which is attached to the Saputelli Certification as Exhibit N.   (O'Donnell Certification at ¶¶ 35-37; Saputelli Certification at ¶ 19)

36.     Sauerland and Valuev ignored O'Donnell's letters and, and on April 17, 2004, Valuev fought in another boxing event in Germany under Sauerland's promotion.  (O'Donnell Certification at ¶¶ 26 and 37)  Valuev's Certification, dated April 17, 2004, filed with this Court in support of his motion, was signed on a date when he was in Germany participating in his third fight under Sauerland's promotion.  (O'Donnell Certification at ¶ 38)

37.     On June 24, 2004, it was announced that Valuev had recently signed a Promotion Agreement with Sauerland, and on July 7, 2004 Sauerland announced that Valuev would be fighting again in Germany on July 24, 2004, under its promotion.   (O'Donnell Certification at ¶¶ 39-40)

38.     On July 7, 2004, the same day that Sauerland announced Valuev's next fight under its promotion, Valuev's counsel transmitted to the Court his motion papers to vacate the Final Judgment herein.

39.     Article 2 of the "Hague Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters" ("the Hague Service Convention") mandates that "Each Contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other Contracting States and to proceed in conformity with the provisions of Articles 3 to 6." (*See* Saputelli Certification at ¶ 21 and Exhibit O thereto)

40.     The Hague Service Convention is not now, nor has it been, since January 1, 2002, available to U.S. citizens as a mechanism for service of judicial documents in the Russian Federation, because of that government's failure to designate a Central Authority through which service may be effected in that country under the Convention.  (*See* Saputelli Certification at ¶¶ 22-26 and Exhibits P, Q, R & S thereto).

41.     Under the Exclusive Agreement, the sole role of "The US Parties," insofar as Valuev was concerned, was as Valuev's promoter.  The context of the Agreement as a whole demonstrates that the introductory sentence to Paragraph 1.1 of the Agreement, referring to "a single management and promotional unit," did not apply to Valuev, but only to "fights of other boxers."  (O'Donnell Certification at ¶ 8; *see also* Exhibit A thereto, *Agreement, ¶ 1 (1.1)(d)*)

42.     O'Donnell never acted as a manager with regard to Valuev, and, in fact, was expressly prohibited from doing so under the terms of the Exclusive Agreement.   In both the introductory paragraph of the Agreement and in Paragraph 4 thereof, Shalayev is designated as Valuev's "Manager." Under Paragraph 4.1 of the Agreement, O'Donnell was required to affirmatively "take all reasonably required steps to protect the existing relationship between Boxer [Valuev] and Manager [Shalayev]," and was further required to agree, "[not] to circumvent, directly or indirectly, Manager's decision-

making authority with regard to Boxer." (O'Donnell Certification at ¶ 8; *see also* Exhibit A thereto, *Agreement*)

43.     Although The US Parties could designate, under Paragraph 4.2, a third party to act as co-manager, all managerial decisions relating to Valuev were at all times controlled by Shalayev, as Manager. That paragraph required the express written consent from Shalayev, as Manager, as to choice of Valuev's contender's, the venues for his fights, his training schedules and routines, as well as the financial arrangement of Valuev's fights and the amount of his purses. (O'Donnell Certification at ¶ 8; *see also* Exhibit A thereto, *Agreement*)

44.     In any event, any questions regarding Shalayev's status and role in the Exclusive Agreement and issues regarding any impact his participation may have had thereon, are moot in light of the fact that Shalayev is no longer Valuev's Manager and "has no continuing relationship" with Valuev. (Exhibit A to Certification of Patrick English; *see also* Valuev Certification at ¶ 6)    Since Berezin withdrew as one of "The Russian Parties" in August of 2001, Valuev is the sole remaining Russian Party to the Agreement. (*See* O'Donnell Certification at ¶ 6).

# IV. **ARGUMENT**

A.    **The Judgment is Not Void Since Valuev Had Personal Service of Process and Actual Notice of the Lawsuit From Its Very Inception; He Knew that the Suit Was Significant; He Knew a Final Judgment Had Been Entered Against Him; and He Demonstrated Disregard For The Consequences of Both The Suit and the Judgment**

Defendant Valuev makes the following two statements in Paragraph 4 of his Certification:

1.     "During 2001 and to date **I had neither a personal residence nor business premises** at that address [the **"Gvardaaysjkaya St. 8/2, Apt. 39"** address in St. Petersburg, Russia]." (Emphasis added)

2.    **"I was never served with a lawsuit or with orders of the Court in this matter."** (Emphasis added)

(*See* Valuev Certification, attached hereto as **Exhibit C**, at ¶ 4).

Valuev asks that the Court vacate the Final judgment pursuant to Federal Rule of Civil Procedure 60(b)(4). Rule 60(b) provides, in pertinent part: "On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: (4) the judgment is void[.]"

A judgment is void only if "the court that rendered it lacked jurisdiction of the subject matter or the parties or entered 'a decree which is not within the powers granted to it by the law.'" Marshall v. Board of Education, Bergenfield, New Jersey, 575 F.2d 417,422 (3d Cir. 1978) (quoting United States v. Walker, 109 U.S. 258, 265-67, 27 L. Ed. 927, 3 S. Ct. 277 (1883)). As the Supreme Court has instructed, the "service of summons is the procedure by which a court having venue and jurisdiction over the subject matter of the suit asserts jurisdiction over the person of the party served." Mississippi Publ'g Corp. v. Murphree, 326 U.S. 438, 444-45, 90 L. Ed. 185, 66 S. Ct. 242 (1946). Effective service of process must be accomplished in compliance with a specific method of service articulated in the applicable rules of civil procedure. See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 320, 94 L.Ed. 865, 70 S. Ct. 652 (1950) (finding that the method of service must be compatible with the requirements of the Due Process Clause).

Applying those principles the Court in Electronics Boutique Holdings Corp. v. Zuccarini, 2001 U.S. Dist. LEXIS 765 (E.D. Pa. Jan. 25, 2001) affirmed 33 Fed. Appx. 647, 2002 U.S. App. LEXIS 9247 (2002)(attached hereto as **Exhibit D**) rejected a defendant's argument that default judgment and a permanent injunction against defendant was void on the contention he was not served with process,

when the facts demonstrated that the defendant was completely culpable for entry of the judgment as he willfully absented himself from the proceedings.  The Court found that the defendant avoided involvement in the case by hiding, returning mail, refusing certified mail, ignoring phone messages from plaintiff's counsel and the marshals. He did not explain his actions, and actively obstructed the fact-finding process by refusing to appear for deposition, in violation of the court's order.  In reaching its holding, the Court examined the Federal Rules of Civil Procedure and found that process is properly served by any of the following methods: (1) handing a copy to defendant; (2) handing a copy to an adult member of the defendant's family who resides with the defendant; (3) leaving a copy at the defendant's home with someone who is living there and is of suitable age and discretion; (4) handing a copy to the manager of the defendant's apartment house; (5) handing a copy to the defendant's agent at defendant's place of business; (6) handing a copy to an agent authorized to receive service of process for the defendant; (7) through the United States Marshals' Service; (8) certified and regular United States mail; and (9) alternative means of service reasonably calculated to provide notice to the defendant.

Applying those standards, the Court examined the facts underlying the plaintiff's attempts to serve the defendant, and concluded that although plaintiff could not demonstrate that the defendant was personally served, it was apparent that the defendant was intentionally avoiding service and he was aware of the lawsuit. The Court held, therefore, that the default judgment would not be vacated, since the plaintiff acted in good faith to ensure that the defendant was notified of the pendency of the action within enough time to present him with the opportunity to be heard.  The Court reasoned:

> The service of process is not a game of hide and seek. Where service is repeatedly effected in accordance with the applicable rules of civil procedure and in a manner reasonably calculated to notify the defendant of the institution of an action against him, the defendant cannot claim that the Court has no authority to act when he has willfully evaded the service of process.

As in <u>Electronics Boutique Holdings Corp. v. Zuccarini,</u> Valuev makes the unsubstantiated contentions that he was never served with process, and that during 2001 he never maintained either a residence or business address at "Gvardesyskaya St. 8/2, Apt. 39" in St. Petersburg. Valuev's newly asserted contentions are obviously false, as they are directly contradicted by compelling contrary evidence, including the following:

1.    On March 12, 2001, following the final execution of the Exclusive Agreement, Berezin, one of  "The Russian Parties" to the Agreement, sent an e-mail to O'Donnell's partner, Synkov, designating "Gvardesyskaya St. 8/2, Apt. 39" as the proper address for Valuev:

> "Valuev, Nikolay Sergeevich St. Petersburg, Krasnoselsky Rayon,
>
> Krasnoye Selo, **Ul**[6]**. Gvardesyskaya 8/2 apt 39**"

(Emphasis added)  (*See* Relevant Fact No. 4 above)

2.    On August 22 and 23, 2001, O'Donnell faxed to Valuev a copy of Russian language translation of the Complaint that was later filed, and advised Valuev and Shalayev that he intended to file it. *See* Exhibits E and F to O'Donnell Certification   (*See* Relevant Fact No. 8 above)

3.    On August 23, 2001 Valuev, personally, sent a signed letter to O'Donnell, acknowledging his receipt of the Russian language translation of the Complaint, and advised that he would be consulting with an "expert," and, for that reason, he would not be responding immediately. (*See* Relevant Fact No. 9 above)

4.    Also on or about August 23, 2001, Shalayev and Valuev both telephoned O'Donnell to discuss the Complaint that they had received from him. O'Donnell's partner, Synkov, participated in the

---

[6] "Ul" is the Russian abbreviation for "Ulitsa," which means "Street."

phone call with O'Donnell, and translated their discussion. During that telephone conversation, Shalayev advised O'Donnell that both he and Valuev were concerned that if O'Donnell proceeded with the filing of the Complaint, that they would be "prosecuted" when they came to the U.S. for further fights. O'Donnell also assured them that if Valuev would come to the U.S. for further fights under his promotion, that he would delay filing the Complaint, and guaranteed them that they would not be "prosecuted." On August 25, 2001, Shalayev faxed O'Donnell another letter, repeating his demand that O'Donnell finance a fight in Russia. Attached as Exhibit H to the O'Donnell Certification are copies of Shalayev's August 25, 2001, letter to O'Donnell and his August 29, 2001 letter to him in response. (See Relevant Fact No. 10 above)

5.      The "expert" with whom Valuev thereafter consulted was a St. Petersburg, Russia attorney, Evgeny Popov ("Popov"). Popov confirmed that he had been retained by Valuev in a letter that he faxed to O'Donnell on September 10, 2001, advising him of his representation of Valuev, in which he stated:

> "I have been retained by Oleg Shalayev and Nikolay Valuev to represent and protect the interests of The Russian Parties in Top Glove Promotions."

(See Relevant Fact No. 11 above)

6.      On October 26, 2001, 10 days after having been served with a filed copy of the Complaint on October 16, 2001, Valuev sent O'Donnell another handwritten, signed letter, acknowledging receipt of service of the Complaint. (See Relevant Fact No. 17 above)

7.      Subsequently, on November 8, 2001, any question as to whether Valuev was, in fact, served with a copy of the filed Complaint and/or had actual notice of the filing of the Complaint against

53397

him and of the nature of the claims therein, was eliminated when Popov filed with the Court an Answer to the Complaint on behalf of both Valuev and Shalayev. (*See* Relevant Fact Nos. 18-19 above)

8.      On page 4 of the Answer filed with the Court on November 8, 2001, in Paragraph 3 thereof, under the heading, "**СТОРОНЫ**" ("The Parties") is the statement:

"3.     Respondent Nicolai Valuev (hereinafter Valuev) appears as a citizen and resident of Saint Petersburg, Russia, and **maintains both his principal place of business and residence at Gvardeyskaya St. 8/2 Apt. 39, Krasnaya Selo, Saint Petersburg, Russia.**" (Emphasis added)

This is the same address that Valuev, in his Certification, now denies, two and a half years later, was either his personal residence or business premises

(*See* Relevant Fact No. 20 above)

9.      Valuev, Shalayev and Popov were all served with copies of the Motion To Strike, the Motion To Enter Default and the Motion For Preliminary Injunction, and, under the heading, "Status," on DHL tracking report relating to Airway bill No. 7435061465, addressed to Valuev, is the following statement:

"**Signed for by: VALUEV**, Shipment delivered
January 11, 2002, 17:15."

(Emphasis added) (*See* Relevant Fact Nos. 21-22 above)

10.     In accordance with Paragraph 10 of the Final Judgment, copies of the Final Judgment, along with certified translations, were delivered by Courier Express Service, located in St. Petersburg, Russia, which company had been designated by the Court to effect service. In its delivery confirmation, a copy of which is attached as Exhibit L to the Saputelli Certification, Courier Express states the "The

US District Court Final Judgment dated March 28, 2002, with certified translation into Russian" ....

"were delivered:

    (a)    To Mr. Shalayev on March 30, 2002 at 9:00 am

    (b)    **To Mr. Valuev on March 30, 2002, at 9:20 am; and**

    (c)    To Lutar legal firm on April 1, 2002 at 4:00 pm."

(Emphasis added) (*See* Relevant Fact No. 28 above)

    11.    O'Donnell has stated in his Certification that in or about July of 2002, he personally spoke with Valuev by telephone from his office in Vineland, New Jersey, and discussed with Valuev the Final Judgment that had been entered against him. O'Donnell's partner, Synkov, who is a Russian native, participated in the conversation along with O'Donnell and provided simultaneous translation of O'Donnell's discussion with Valuev. O'Donnell told Valuev that if he came to the United States to participate in boxing events under the Agreement, that he wouldn't let either the litigation or the fact of the judgment interfere with them re-establishing a good working relationship. O'Donnell also told Valuev that if he would come to the U.S. to fight under his (O'Donnell's) promotion, that he would negotiate favorable terms to satisfy the money judgment against him over an extended period of time out of net proceeds of future events in which he participated. According to O'Donnell, Valuev expressed appreciation during their conversation for O'Donnell's comments, thanked him and said he would consider O'Donnell's request. (*See* Relevant Fact No. 29 above).

    The facts reveal the Valuev was served with (a) the complaint; (b) with copies of the Motion To Strike, the Motion To Enter Default and the Motion For Preliminary Injunction as well as the final judgment; he secured counsel, he made repeated references to the Complaint and the entry of the final judgment for more than two years. As in <u>Electronics Boutique Holdings Corp. v. Zuccarini,</u> the facts

demonstrate that Valuev was completely culpable for entry of the judgment as he willfully absented himself from the proceedings. Therefore, Valuev cannot claim that the Court has no authority to act and that the Final Judgment is void.

**B.    Service of Process Under the Hague Service Convention Was Neither Required Nor Possible**

Valuev also contends that a copy of Plaintiff's motion for default judgment and injunctive relief had to have been served upon Valuev pursuant to the terms of the "Hague Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters" ("the Hague Service Convention"), since that Convention presumably became effective on December 1, 2001.  In his Brief, Valuev cites the following statement from the Advisory Committee Notes on Rule 4, that:  "[u]se of the Convention procedures, <u>when available</u>, is mandatory if documents must be transmitted abroad to effect service…"  *See* Defendant's Brief at 5.

However, as explained in the Saputelli Certification, at Paragraphs 20-26 and in Exhibits O through S thereto, the Hague Convention, at all times relevant to this case, was <u>not</u> available to effect service of documents in the Russian Federation.  Article 2 of the Convention mandates that "Each Contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other Contracting States and to proceed in conformity with the provisions of Articles 3 to 6."  Articles 3 to 6 set forth the duties and functions that the designated Central Authority of the "Contracting State," in this case, the Russian Federation," must implement and perform before any legal document can be served pursuant to the requirements of the Convention.

Article 10(a) provides that the Convention shall not interfere with the freedom to send judicial documents by postal channels directly to persons abroad, provided the country of destination does not object. Article 19 allows service by any method of service permitted by the internal laws of the country in which service is made."  Beverly L Jacklin, J.D., Annotation, *Service of Process By Mail in International Civil Action As Permissible Under Hague Convention*, 112 A.L.R. Fed. 241 (1993).

Although the Russian Federation has agreed to abide by the Hague Convention, because it has not yet designated a Central Authority, the United States Department of State has not recognized Russia's accession as a Convention member.  A copy of a publication maintained on the official website of the Department of State, listing all of the designated "Foreign Central Authorities" of the signatory countries, is attached to the Saputelli Certification as Exhibit P thereto.  As noted on pages 17 and 18 thereof, the Russian Federation has still failed to designate a foreign authority, and our State Department continues to seek clarification from both the Russian government and the Hague Conference on Private International Law on this issue.

The Declaration of Art Tucker, of Process Service Network, a firm specializing in international service of documents confirms that the Hague Convention has not been available for service of documents in the Russian Federation from January 1, 2002, and continuing up through the present time. *See* Exhibit Q to Saputelli Certification.

The United States Department of State as advised Plaintiff's counsel in a letter dated July 21, 2004, that:

> "For all practical purposes, although the Hague Service Convention is technically in force for the Russian Federation, it has never been fully implemented and service via the central authority mechanism contemplated by the Convention is not available for service of judicial documents on any person in the Russian Federation."

A copy of the letter from the United States Department of State, dated July 21, 2004, is attached hereto as **Exhibit A.** *See also* Saputelli Certification at ¶¶ 25-26.

Defendant Valuev cites <u>Marcantonio v. Primorsk Shipping Corp.</u>, 206 F.Supp.2d 54, 56 (2002), in which the District Court in Massachusetts claimed that the Hague Convention became effective in Russia on November 15, 2001. Obviously, the parties in that case did not exercise appropriate diligence in investigating the status of the implementation of the Hague Convention in the Russian Federation, and thus did not bring all pertinent facts to the attention of that Court, other than the date on which the Convention presumably became "effective," and did not address the question of whether service under the Convention was actually "available" at that time.

The Defendant mistakenly relies on *Marcantonio* as having held that the judgment was vacated because service Russian Corporation in Russia was improper due to non-compliance with the Hague Convention. To the contrary, the defendant in that case was served via mail to the defendant's counsel in Canada and New York. Furthermore in Marcanotonio, the defendant being served was a corporation, not an individual, therefore making <u>Forum Fin. Group, LLC v. Harvard College</u>, 199 F.R.D. 22, 23-24 (D.Me.2001) applicable. In *Forum*, the defendant who lived in Russia was properly served via his attorney in New York City

In <u>Isometrics v. U.S. Energy Research & Dev. Agcy.</u>, 434 F.Supp. 1155 (D.N.J.1977), a Japanese defendant sought compliance with the Hague Convention after being served by mail pursuant to F.R.Civ.P. 4(i)(1)(D). Judge Biunno did not find it necessary to decide the issue, concluding that defendants, 'even if not effectively served with process, are at least on notice of ISO's (plaintiff's) claim.'" <u>Citron v. W & D Machinery Co., Inc.</u>, 182 N.J.Super. 126,133, 440 A.2d 76, 80 (1981) (quoting 434 F.Supp. at 1158).

If the Convention allows service by mail, than certainly personal service would, equally, be allowable. The Russian Federation cannot expect service of process to be in accordance with the Hague Convention until a central authority is in place. In the meantime service allowed by the laws of the country should be deemed proper. "As long as the nation concerned has not, in its ratification of the Convention or in any other part of its law, imposed any limits on other methods of service, the other methods remain available." Beverly L Jacklin, J.D., Annotation, *Service of Process By Mail in International Civil Action As Permissible Under Hague Convention*, 112 A.L.R. Fed. 241 (1993) (citing <u>Cartwright v. Fokker Aircraft U.S.A., Inc.</u>, 713 F.Supp. 389 (1988, ND Ga)). The Defendant, in the case at bar, was properly served, has acknowledged in writing that he was served, and even retained Russian counsel to prepare and file an answer to the Complaint. Accordingly, service made upon Defendant Valuev in this case was proper and the Hague Convention rules are inapplicable to the case at bar.

**C.    Valuev Has Presented No Basis To Vacate The Default Judgment Under Fed. R. Civ. Pro. 60(b)(6)**

Obviously recognizing that the Final Judgment is not void, Valuev relies on FRCP 60(b)(6), contending that his alleged meritorious defense constitutes "good cause" to vacate the judgment. Valuev overlooks, however, that FRCP 60 (b)(6) is applicable, only when the defendant presents extraordinary circumstances, is not culpable for the entry of the Judgment and moves for relief in a reasonable time, all of which are utterly absent in this case.

**(i)     The Failure to File the Motion Within A Reasonable Time Precludes the Defendant's Request for Relief From Final Judgment Under Rule 60(b)**

It is well-established in the Third Circuit that the decision to vacate an entry of default judgment is left primarily to the discretion of the district court. See Hritz v. Woma Corp., 732 F.2d 1178, 1181 (3d Cir. 1984). In exercising its discretion, however, the district court must consider whether the defendant has a prima facie meritorious defense and whether the default was a result of the defendant's culpable or inexcusable conduct." Id.; Emcasco Ins. Co. v. Sambrick, 834 F.2d 71, 73 (3d Cir. 1987);  Gold Kist, Inc. v. Laurinburg Oil Co., Inc., 756 F.2d 14, 19 (3d Cir. 1985).     To that end, a default judgment may not be set aside if the defendant, in failing to respond to a complaint, has exhibited some degree of culpable conduct. Conduct is considered to be culpable in this context if it "willful" or taken "in bad faith." Gross v. Stereo Component Systems, Inc., 700 F.2d 120, 122 (3d Cir. 1983); Int'l Broth. of Elect. Workers v. Skaggs, 130 F.R.D. 526, 529 (D. Del. 1990).

F.R.C.P. 60(b)(6) also requires that the motion to vacate a default judgment be timely made. Although relief under subsection (b)(1) requires that the motion be made within one year from the date of the judgment, motions pursuant to subsection (b)(6) must made within a reasonable time, and reasonable promptness is required.  Seanor v. Bair Transport Co., 54 F.R.D. 35 (E.D. Pa. 1971).   As noted by the Pennsylvania Supreme Court, "If procrastination is the thief of time…it is also the pillager and despoiler of rights, privileges and prerogatives.   Gloeckner v. School District of Township of Baldwin, 405 Pa 197, 202, 175 A.2d 73, 76 (1961).

When a defaulting party offers no reasonable explanation for his failure to respond to the summons and complaint, no relief will be granted.  Bricks, Inc. v. CME Housing Group, 209 F.R.D. 416 (W.D. Tenn. 2002); Admiral Home Appliances, Div. Of Magic Chef, Inc. v. Tenavision, Inc., (D.C. N.J.

53397                                                30

1982) 585 F.Supp. 14, aff'd without op 735 F2d 1347 (3rd Cir.) (Failure to satisfy burden under Fed. R. Civ. Pro. 60(b) when no facts were presented to explain the inactivity between the date of service, and the date the papers were sent to the lawyer) Id. at 15.

In Admiral Home Appliances, Div. Of Magic Chef, Inc. v. Tenavision, Inc. the court recognized that the defendant's arrogance and disregard of the consequences of a lawsuit justifies the denial of a vacation of a default judgment, reasoning:

> Other fact matters mentioned during argument but not presented as part of the record, cannot be considered. Nor will it do to mention undisclosed defenses especially when no draft of answer, setting out all defenses, is submitted with the motion itself. Defendant knew, from the demand letter of February 18th that the claim was for an insignificant amount. His attitude, in his calls to general counsel and the attorney of record, shows an arrogance and disregard of the consequences, not mistake, inadvertence or excusable neglect."
> Id. at 16.

In affirming the District Court in Admiral Home Appliances, the Court of Appeals for the Third Circuit stated:

> Our prior cases make it clear that the party in default must show that the default was not caused by his own culpable conduct in order to have it set aside. Defendant has not made such a showing.

735 F2d 1347

As in Admiral Home Appliances, Valuev had direct knowledge of the action filed by O'Donnell. Valuev was informed about the suit, retained counsel, contacted the plaintiff, and then failed to be diligent in his own defense. That was recognized by the Court at the hearing conducted on February 13, 2002, the Court in the present case stated:

> I do find that three-and-a-half months since the Complaint was served in early November of 2001 is much more than a sufficient time for these defendants

53397                                                31

to retain an attorney in New Jersey, to respond to the allegations, if they have a response, and to participate in this forum.

*See* Transcript of February 13, 2002 hearing, at 16, conducted before the Honorable Jerome B. Simandle on, attached as Exhibit I to Saputelli Certification.

Here, Valuev has filed his motion to vacate:

(1)     nearly two years and nine months following service of the Complaint upon him;

(2)     more than two years and three months after being served with a copy of the Final Judgment; and

(3)     approximately two years after he had a conversation with O'Donnell about the Final Judgment.

Valuev's utter disregard of the lawsuit and the mandates of the Final Judgment for well over two years, constitutes arrogance and complete disregard of the consequences of such conduct. Valuev is obviously moving to vacate the Judgment at this late date simply because the Judgment interferes with his new plans. Indeed, Sauerland Event has now entered into the picture and is obviously interested in promoting Valuev. The Judgment was caused by Valuev's own culpable conduct, and Valuev's motion is untimely made. Therefore, the Judgment should not be set aside. Admiral Home Appliances, 735 F2d 1347.

**(ii)     Valuev Has Not Presented "Extraordinary Circumstances" to Warrant Relief Under Fed. R. Civ. Pro. 60(b)(6)**

Valuev's failure to present any extraordinary circumstances further bars the relief he seeks. The remedy provided by Rule 60(b)(6) is "extraordinary and special circumstances must justify granting relief under it." Page v. Schweiker, 786 F.2d 150, 158 (3d Cir. 1986). Contrary to Valuev's contention, the presence of a meritorious defense does not constitute "just cause" to set aside a default judgment under Fed. R. Civ. Pro. 60(b)(6) and much more must be demonstrated. See, Marshall v.

Board of Educ. 575 F.2d 417, 425 (3d Cir. 1978) (holding that changes in law are not extraordinary);

Martinez-McBean v. Govt. of Virgin Islands, 562 F.2d 908, 911, 14 V.I. 79 (holding that legal error,

inconsistencies with legal precedent, and impatience with pro se plaintiff's lack of legal skill are not

extraordinary); Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir. 1977) (holding that changed

circumstances are not extraordinary); Stradley v. Cortez, 518 F.2d 488, 493 (3d Cir. 1975) (holding that

an allegation that the jury did other than what it intended was not extraordinary).

In addition, "the broad powers granted by clause (6) are not for the purpose of relieving a party

from the free, calculated, and deliberate choices he has made." Mayfield v. Vanguard Sav. & Loan

Ass'n, 1989 U.S. Dist. LEXIS 11017, No. Civ.A.88-0410, 1989 WL 106986 at *2 (E.D. Pa. Sept. 8,

1989) (holding that the unrevealed and inadequate representational activities of a former attorney are not

extraordinary circumstances). A party to a lawsuit remains under a legal duty to protect his own interest.

Id. (citing Ackerman v. United States, 340 U.S. 193, 198, 95 L. Ed. 207, 71 S. Ct. 209 (1950)).

Responsibility for monitoring the status of a case, therefore, rests with the defendant. Id. (citing Pryor v.

U.S. Postal Service, 769 F.2d 281, 287 (5th Cir.1955)). Also, except in extraordinary circumstances, a

represented party in a lawsuit is bound by the acts of its attorney. 1989 U.S. Dist. LEXIS 11017, at *3

(citing Link v. Wabash R.R. Co., 370 U.S. 626, 633-34, 8 L. Ed. 2d 734, 82 S. Ct. 1386, (1962)).

Furthermore, ignorance or carelessness on the part of a litigant's attorney is not sufficient grounds for

relief under rule 60(b)(6). Id.; Hough v. Local 134 IBEX, 867 F.2d 1018, 1022 (7th Cir. 1988); Ben

Sager Chemicals Int'l v. E.Targosz & Co., 560 F.2d 805, 809 (7th Cir. 1977); Hoffman v. Celebrezze,

405 F.2d 833, 835 (8th Cir. 1969).

No facts have been presented by Valuev that demonstrate that there are extraordinary and special

circumstances that warrant that the Final Judgment be set aside. Nor has Valuev demonstrated another

independent element for relief under Fed. R. Civ. Pro. 60(b)(6), the absence of a willful disregard of the lawsuit. Therefore, Valuev has failed to satisfy his burden under Fed. R. Civ. Pro. 60(b)(6) and his motion should be denied.

### D.    The Exclusive Agreement Is Enforceable

Because Valuev has failed to demonstrate the presence of special and extraordinary circumstances for relief under F.R.C.P. 60(b)(6), the substantive arguments he presents on the purported defenses that he could have asserted years ago, need not be considered. Assuming arguendo, that the merits of defendant's arguments are to be considered, they are without basis.

### (i)    The Agreement Does Not Violate the Muhammad Ali Act

Defendant's allegation that that Agreement that is the subject of Plaintiff's Final Judgment, violates the "Muhammad Ali Act, " 15 USC § 6308 *et seq.* ("the Act"), overlooks the fact that the Agreement confers on O'Donnell the exclusive rights to promote all of Valuev's professional boxing matches throughout the world, except Russia.   The Act expressly reflects that it does not apply to boxing matches that take place outside the United States. See 15 U.S.C. 6301(8) ("Professional Boxing Match" is defined as " a boxing contest **held in the United States** between individuals for financial compensation." (emphasis added))  In addition, the Act, by its plain language, only applies to a match in the United States that is to have 10 rounds or more. See 15 U.S.C. 6301(8).

Defendant Valuev has failed to assert a meritorious claim under the Muhammad Ali Act with respect to all the boxing matches that O'Donnell was authorized to promote outside the United States. The Muhammad Ali Act is not applicable to the boxing matches promoted throughout the world, outside the United States.

53397                                             34

Nor has the Defendant demonstrated that the Agreement violates the Act with respect to boxing matches that are conducted in the United States. To the contrary, the Agreement was designed to confer on O'Donnell the exclusive right to promote any and all of Valuev's professional boxing matches throughout the world, except Russia, and at the same time, not infringe upon the other agreements already in effect between the Russian Parties, or to violate the applicable laws of the various countries and states, including, but not limited to, the firewall provisions set forth in 15 USC § 6308(b).

In presenting his interpretation of the Agreement, Valuev considers the agreement, in isolation, and he presents provisions out of content, and completely ignores other controlling language of the agreement. When presenting his arguments, Valuev also disregards the fundamental tenets of contract law. That is, in considering the terms of any contract, the circumstances and industry context of the contract must be taken into consideration in order to give the parties' intent proper effect. Despite that settled standard, Valuev completely ignores the facts surrounding the execution of the Agreement, the parties' subsequent performance of the Agreement and the custom and practice of the Boxing industry. Instead, he considers the Agreement in isolation, to obviously present a misguided and inaccurate portrayal of the Agreement.

Yet, the determination of whether an individual serves as a "promoter" or a "manager" requires a fact sensitive analysis. Section 6301 of that Act defines the terms "manager" and "promoter" as follows:

> The term "promoter" means the person **primarily responsible** for organizing, promoting, and producing **a** professional boxing match....
> (15 USC 6301(9) emphasis added)
> "Manager" means a person who receives compensation for service **as an agent or representative of a boxer**. (15 USC 6301(5) (emphasis added)

In <u>Marchio's International productions v. Letterlough and Marley</u>, 237 F.2d (E. D. Pa. 2002) the court recognized that the determination of whether a person serves as a "promoter" or "manager" under the Muhammad Ali Act, or both, required a fact sensitive analysis that could not be evaluated without a plenary trial. There, the Court grant granted a promoter's request for injunctive relief, against a boxer and his manager, which precluded the boxer, from engaging in professional fights unless all the advertising materials identified the promoter as the promoter or co-promoter.  In that case, on June 2, 1998, the plaintiff had entered into a written Boxer/Manager agreement, for a term of three years, which terminated by its own terms on June 2, 2001.  In the meantime, on June 20, 2000 the promoter entered into an exclusive promotional agreement with the boxer, to act as a promoter for the boxer's professional bouts.  The court found that the promoter had performed significant work in building up the boxer as a nationally ranked and reputable fighter, which provided him with a protected legal interest in continuing, during the term of the contract, to be identified as the boxer's promoter.

The court found that the boxer's claims that the promoter had a conflict of interest, for serving as both a promoter and a manager, did not preclude the relief that the promoter requested. The court found that conflicting issues of fact precluded it from determining whether the promoter also served as a manager during the specific fight at issue. The boxer claimed he regarded the promoter to also be his manager, and the promoter denied he served in the dual roles after the management agreement expired. When evaluating the evidence, the court described the distinctions between the two positions, stating:

> At the hearing, the testimony was consistent that there is a distinction between the duties of a promoter and a manager. A promoter arranges the bouts and any television rights, and his interest is to maximize the revenues for the event, as well as his own revenues; the promoter has no fiduciary duty to the fighter.

53397                                         36

On the other hand, the manager has the fighter's best interests at heart, has a fiduciary relationship with the fighter, and often assists the fighter in the fighter's corner during the bout. Generally, the manager receives a cut of the fighter's purse.

The financial arrangement between the fighter and his manager, on the one hand, may be subject to state regulation, but the financial relationship between the fighter and the promoter, on the other, is subject to negotiation between them. 237 F. Supp. at 584.

Here, applying these principles, it appears on its face that the Exclusive Agreement is strictly a Promotional Agreement, in which Joseph O'Donnell and Ghenna Synkov (the US Parties) were granted the exclusive right to promote the boxer throughout the world, including in the USA, but not in Russia. O'Donnell underscored that interpretation of the Exclusive Agreement when, on October 11, 2001, he rejected Shalayev's demand that O'Donnell obtain a New Jersey promoter's license for him, that would authorize him to be a Co-Promoter in the U.S., along with Top Glove, and advised him:

> For you to be a co-promoter with Top Glove in the United States would not only be a circumvention of the Exclusive Representation Agreement, but would be illegal under New Jersey boxing laws, as well as under most state boxing statutes throughout the United States.

(*See* Relevant Fact No. 12).

Consistent with that understanding, Paragraph 4 of the Agreement, entitled "Management," expressly preserves the distinction between the Manager and Promoter. In that provision, the US parties expressly agree "to protect the existing relationship between Boxer and Manager." In addition, the US Parties agree that they will not serve as manager, by expressly agreeing "that they will not circumvent, directly or indirectly, Manager's (Shalayev's) decision-making authority with regard to Boxer." (*See* Relevant Fact No. 42).

Defendant claims that the "firewall" provisions of the Muhammad Ali Act are violated by section 4.2 of the Agreement, which authorizes the US parties to "designate its representatives to act as

53397

37

co-managers." By its express terms, any co-managers that may be appointed by the promoters would be serving the promoter's interest, not the "boxer's." Therefore, the co-managers would not fall within the scope of a "manager" under the Muhammad Ali Act as they would not be serving "as an agent or representative of a boxer." 15 USC 6301(5) That is evident by the terms of the Agreement, since the co-managers' authority is expressly limited in that "Consent of Manager is writing will be necessary in taking a decision on the following matters:" choice of contenders for the Boxer, venue for fights, training schedules and routines for Boxer and financial arrangements of fights, including the amount of the purse. (*See* Relevant Fact No. 43).

The Defendant points to the use of the term "manage" in a number of places in the Agreement and contends that it means that the promoter also served as a manager. That interpretation not only disregards the term "manager" in the Muhammad Ali Act, but also ignores the use of the terms under the Agreement, which, in each case, authorized the US Parties to "manage **fights**," not the boxer himself. (*See* Paragraph 1.1(d); Paragraph 3.)

Defendant also criticizes Section 7 of the Agreement, which provides that 50% of the net proceeds of fight revenues are to be provided to the "Russian Parties," contending that there is no way to determine the amount that Valuev is to receive under the Agreement, *vis-a-vis* the other two Russian Parties, Shalayev and Berezin. That argument is moot, however, as Berezin withdrew as one of the Russian Parties in August of 2001, and, according to Valuev, Shalayev is no longer his Manager and has "no continuing relationship" with him, leaving Valuev as the sole Russian Party under the Agreement. (Relevant Fact Nos. 2, 5 and 44)

Valuev's complaints about the absence of a specific allocation between/among the Russian Parties (of whom he is the only remaining party) in the Agreement also overlooks the other agreements

in existence between the Russian Parties when the contract was executed. Indeed, the Agreement expressly recognized that Valuev had agreements in place with the other Russian Parties, Shalayev, as his "Manager", and with Berezin, as his "Consultant". Those existing agreements, and the applicable State, Federal and international laws, govern the manner in which the proceeds were to be allocated among the Russian Parties. That would be permissible under the conflict of interest provisions of the Muhammad Ali Act, which expressly exempts from the scope of the Act a promoter's payments to managers **"for amounts received as consideration under the manager's contract with the boxer."** 15 USC § 6308(b)(ii) (emphasis added).

### (ii)    The Agreement Is Not Indefinite

Defendant also asserts that the Agreement is "indefinite," since there is no way for Valuev to determine what he is to receive for his "purses." Valuev overlooks that in circumstances where market conditions make it difficult to determine exact terms as to price, parties can agree to an open contract price, which will later be negotiated in light of future market conditions.

Under certain circumstances, such as those presented here, an enforceable agreement can be reached even where the parties leave an essential term like price open to future negotiation. This principle is embodied in the Restatement (Second) of Contracts, § 33, which states that "[t]he terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Comment e to the Restatement, entitled *Indefinite price*, specifically recognizes certain scenarios under which an enforceable agreement exists even though parties do not agree to a specific price.

Where the parties manifest an intention not to be bound unless the amount of money to be paid by one of them is fixed or agreed, and it is not fixed or agreed, there is no contract. Uniform

Commercial Code § 2-305(4).  Where they intend to conclude a contract for the sale of goods, however, and the price is not settled, the price is the reasonable price at the time of delivery if (a) nothing is said as to price, or (b) the price is left to be agreed by the parties and they fail to agree, or (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.  U.C.C. § 2-305(1).  *Or one party may be given power to fix the price within limits set by agreement or custom or good faith.  Similar principles apply to contracts for the rendition of services.*

Restatement (Second) Contracts, § 33, comment e, *Indefinite price* (emphasis added).

Consistent with these principles, the Court in Mantell v. Int'l Plastic Harmonica Corp., 141 N.J.Eq. 379, 55 A.2d 250 (1947), upheld the validity of an exclusive sale and distributor's contract where it was not practical to fix a price:

> 'The general purpose of the agreement is to be considered in ascertaining the sense of particular terms.  The design of the parties to a written contract is to be collected from the instrument as an entirety.  And the writing is to have a reasonable construction.  Disproportionate emphasis upon a single provision does not serve the purpose of interpretation.  Words, phrases and clauses are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intention.  The literal sense of the terms may be qualified by the context.  The significance of a particular part of the writing is determined by a consideration of all its parts.  It is the revealed intention that is to be effectuated.  In a word, the standard of interpretation is the meaning that would be attached to the integration by a reasonably intelligent person.  And, in the quest for the common design, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain, are to be regarded.
>
>        *              *                 *
>
> The character of the contractual arrangement is such as to preclude explicitness as to quantity and prices.  This is especially so where, as here, the product is new and untried and its potential worth and market value and the cost of manufacture and distribution are unknown quantities.
>   *      *      *      *

> Contracts of this category are to be given a practical interpretation that will effectuate and not defeat the common intention in an area of conventional action that, due to unpredictable market conditions, production factors, and so on, ordinarily does not permit of greater certainty and definiteness in the particulars mentioned.

Mantell, 55 A.2d 250; *see also* Laveson v. Waner Mfg. Corp., 117 F.Supp. 124 (D.N.J. 1953).

Like New Jersey, other state courts have upheld contracts that have open price terms left for future negotiations. For example, in Marcor Management, Inc. v. IWT Corp., No. 96-CV-1519 FJS, 1998 WL 809011 (N.D.N.Y. Nov. 17, 1998) (attached hereto as **Exhibit E**), the court dealt with a long-term, exclusive contract that did not contain a price term due to the difficulty in determining what the future price would be.

In Marcor, the parties entered into a long-term, three-year exclusive agreement and a ten-year extension agreement for the rights to market certain "soil remediation technologies." *See Id.* at *1. The defendant argued the agreements were unenforceable "because neither set forth the price, or the method by which price would be determined, for [defendant's] technologies on future projects." *Id.* at *5. The plaintiff countered, arguing "a specific price term was left out of the agreements because neither party had any way of knowing what the future price would be. . . ." *Id.* at *6. The plaintiff further argued that "the price term was left open with the intent that it would be fixed in the future as projects arose." *Id.*

The Marcor court held the contract was enforceable even though it left the term of price open. In doing so, the court construed the contracts, noting that "a reasonable interpretation of this provision is that the parties would mutually agree upon the price at a later date." *Id.* at *6. Acknowledging the rationale for the lack of price terms, the court found that "it was almost impossible to set a price for the future projects." *Id.* While the court cited the general rule that "the terms of the contract [must be] definitely understood and agreed upon and that nothing is left for future settlement," it also recognized

41

"the fact that a term is left open does not automatically render a contract unenforceable." *Id.* (*citing* Restatement (Second) Contracts, § 33). Based on these findings, the court held the contracts were valid because the parties intended to "agree to determine price by mutual consent." *Id.* (*citing* Allied Disposal, Inc. v. Bob's Home Serv., Inc., 595 S.W.2d 417 (Mo.Ct.App. 1980).

Similarly, the court in Allied Disposal, Inc. v. Bob's Home Service, Inc., 595 S.W.2d 417 (Mo.Ct.App. 1980), upheld an exclusive, long-term contract that failed to specify price terms. Like the situation in Marcor (and here), due to market and regulation conditions, "establishing a price in advance for each [transaction] type was difficult or impossible." 595 S.W.2d at 421.

Not surprisingly, these principles have also been applied in the boxing context. In Don King Productions, Inc. v. Douglas, 724 F.Supp. 741 (S.D.N.Y. 1990), a federal district court upheld the validity of an exclusive promotional agreement that provided for the mutual negotiation of purse amounts under certain circumstances. There, the then heavyweight champion of the world, James "Buster" Douglas, argued his exclusive promotional agreement with promoter Don King was unenforceable because it was indefinite as to the essential term of consideration. The District Court recited the pertinent facts, which were undisputed, as follows:

The Promotion Agreement provided for payment of $25,000 to Douglas in return for his granting DKP the exclusive right to promote his bouts for a stated term. Compensation for the individual bouts that were contemplated by the Promotion Agreement (numbering no fewer than three per year, with the exception of the first contract year) was made subject to further negotiation and agreement, with the agreed-to terms to be set forth in the individually-negotiated bout agreements. The Promotion Agreement specified a floor level of compensation of $25,000, plus $10,000 in training expenses, for

these fights, *except that in the case of a title bout or defense of such a bout, no floor (or ceiling) was provided, the purse to be "negotiated and mutually agreed upon between us."*

742 F.Supp. at 761 (emphasis added). Based on these undisputed facts, the court held the promotional agreement was enforceable:

> The writing manifests in definite language Douglas and DKP's agreement to deal exclusively with one another with respect to title defenses and to negotiate in an effort to reach a mutual understanding as to the open price term for such a defense. For that reason, the exclusivity provisions of the Agreements are not void *ab initio* on grounds of price indefiniteness.
> 742 F.Supp. at 762.[7]

Like the contracts in <u>Marcor,</u> <u>Allied,</u> <u>Mantell</u> and <u>Don King</u>, it would be difficult, if not impossible, to predict the market conditions in order to establish a set price for future transactions when the Agreement was executed. The parties here, as in the above-cited cases, recognized this inherent uncertainty in the boxing industry, and in order to account for it, they intended to be bound by an agreement that provided for the possibility of renegotiating purses on an ongoing basis. In situations such as here, where it is difficult to determine price in long-term, exclusive contracts, the law affords parties the opportunity to enter into a binding contract that calls for the future negotiation of price based on the changed conditions.

Thus, contrary to Valuev's arguments, the Agreement is not incomplete or unenforceable, and he has failed to make out a *prima facie* showing of a "meritorious defense."

---

[7] It is important to note that, while Douglas and DKP entered into a bout agreement for the Tyson-Douglas fight providing for a minimum purse of $1 million for the first three title defenses in the event Douglas beat Tyson, that minimum purse provision was only applicable for the first three title defenses, leaving no set minimum for subsequent title bouts. Thus, the *Douglas* case stands for the proposition that a promotional agreement that does not provide set minimums under certain contingencies is still a valid and binding exclusive agreement.

## V.  <u>CONCLUSION</u>

Based on the foregoing reasons, it is respectfully argued that Defendant's, Nicolai Valuev's, motion has not been brought within a reasonable time period, as required by F.R.C.P. 60, and that he has failed to provide any explanation for his delay or to otherwise disclose any extraordinary circumstances justifying the vacation of the default judgment against him.  Accordingly, Plaintiff, Joseph O'Donnell, respectfully requests that this Court deny Defendant Valuev's motion, with prejudice.

Respectfully submitted,

**OBERMAYER REBMANN MAXWELL HIPPEL LLP**

Dated: July 22, 2004        By: _____

GREGORY D. SAPUTELLI, ESQUIRE (7140)
KIMBERLY D. SUTTON (8229)
*Co-Counsel for Plaintiffs*

and

**BOCHETTO & LENTZ, P.C.**

Dated: July 22, 2004        By: _____

GEORGE BOCHETTO, ESQUIRE (*pro hac*)
DAVID P. HEIM, ESQUIRE (DPH 5846)
*Co-Counsel for Plaintiffs*

53397                                    44